UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Tammy Green

       v.                                    Civil No. 11-cv-300-JL

Sears Holding Corporation


REPORT AND RECOMMENDATION


        Tammy Green has filed a complaint (doc. nos. 1, 4, 6, 8 and

9),[1] alleging that during her employment at Sears in 2008 and

2009, she was suffered illegal retaliation and was subjected to

discrimination based on her age, gender, religion, race,

national origin, and disability.  Because Green is proceeding

pro se and in forma pauperis, the matter is before the court for

preliminary review to determine, among other things, whether the

complaint states any claim upon which relief might be granted.

See 28 U.S.C. § 1915(e)(2); United States District Court for the

District of New Hampshire Local Rule ("LR") 4.3(d)(1)(B).

_____

        [1]Green filed an initial complaint (doc. no. 1) followed by
four addenda to that complaint (doc. nos. 4, 6, 8 and 9).  The
court construes the complaint to consist of all five documents,
and they will be considered, in the aggregate, to comprise the
complaint in this matter for all purposes.

## Standard of Review

Under LR 4.3(d)(1)(B), when a plaintiff commences an action pro se, the magistrate judge conducts a preliminary review.  The magistrate judge may issue a report and recommendation after the initial review, recommending that claims be dismissed if the court lacks subject matter jurisdiction, the defendant is immune from the relief sought, the complaint fails to state a claim upon which relief may be granted, the allegation of poverty is untrue, or the action is frivolous or malicious.  See id. (citing 28 U.S.C. § 1915(e)(2) & Fed. R. Civ. P. 12(b)(1)).  In conducting a preliminary review, the magistrate judge construes pro se pleadings liberally, to avoid inappropriately stringent rules and unnecessary dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pleadings liberally in favor of pro se party); Castro v. United States, 540 U.S. 375, 381 (2003).

To determine if the complaint states any claim upon which relief could be granted, the court applies a standard analogous to that used in reviewing a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  The court decides whether the complaint contains sufficient factual matter, accepted as true, to state a

2

claim to relief that is plausible on its face.  See <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009).

To make this determination, the court employs a two-pronged
approach.  See <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1,
12 (1st Cir. 2011).  The court first screens the complaint for
statements that "merely offer legal conclusions couched as fact
or threadbare recitals of the elements of a cause of action."
<u>Id.</u> (citations, internal quotation marks and alterations
omitted).  A claim consisting of little more than "allegations
that merely parrot the elements of the cause of action" may be
dismissed.  <u>Id.</u>  The second part of the test requires the court
to credit as true all non-conclusory factual allegations and the
reasonable inferences drawn from those allegations, and then to
determine if the claim is plausible.  <u>Id.</u>  The plausibility
requirement "simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence" of illegal
conduct.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007).
The "make-or-break standard" is that those allegations and
inferences, taken as true, "must state a plausible, not a merely
conceivable, case for relief."  <u>Sepúlveda-Villarini v. Dep't of</u>
<u>Educ.</u>, 628 F.3d 25, 29 (1st Cir. 2010); <u>see</u> <u>Twombly</u>, 550 U.S. at
555-56 ("Factual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at ___, 129 S. Ct. at 1950 (citation omitted). In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits." Ocasio-Hernández, 640 F.3d at 13. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Id.

## Background

I.   Complaint

Green's complaint consists of several pages authored by Green, approximately 100 pages of her personal calendar, and a number of documents related to Green's administrative complaints against Sears before the New Hampshire Commission on Human Rights ("NHCHR") and the Equal Employment Opportunity Commission

("EEOC").[2]  The court notes that in the material Green includes in her complaint there are a number of documents and reports that relate to her administrative actions before the NHHRC and the EEOC.  Although the court must credit as true Green's assertions at this stage of the proceeding, the court notes that there is significant disagreement between Green's version of events and that supplied by others involved in this matter.  To the extent the discrepancies are relevant to this preliminary review, the court will note them where applicable.

II.  Course of Employment

Tammy Green worked at Sears in Newington, New Hampshire, from July 28, 2008, until April 16, 2009.  During her tenure at Sears, Green worked as a Merchandise and Consumer Assist Associate, primarily assisting customers in the clothing department.  Green states that she worked in the "bra department."

Green alleges that prior to and during the time she worked at Sears, she suffered from a number of significant mental illnesses and impairments for which she was collecting social

_____

[2]Green has attached a number of documents to her complaint. The documents will be considered to be part of the complaint for all purposes.  See Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

security disability benefits.  These illnesses include:  bipolar disorder, anxiety disorder, panic disorder, post-traumatic stress disorder, attention deficit disorder, obsessive-compulsive disorder, depression, Tourette's syndrome, social anxiety disorder, dyslexia, agoraphobia, and claustrophobia. Green did not tell anyone at Sears about her disabilities when she was hired.

Green states that when she was hired she asked to work fifteen to twenty-five hours per week because the stress of a full-time schedule aggravated her mental illnesses.  During Sears' busy back-to-school and holiday shopping seasons, August through November 2008, Green was scheduled to work full-time.

Green asserts that her mental health condition began to decline due to the stress of maintaining a full-time schedule. On December 12, 2008, Green and her husband met with her manager, Joey Gray, and told him that she suffered from bipolar disorder and anxiety disorder, the full-time schedule was aggravating her condition, and she wanted to work fewer hours. Green states that during that meeting, the couple advised Gray that Green had a disability which required a part-time schedule as an accommodation, and for which she received social security disability benefits.  Green states that "[t]his meeting

completely inferred I had a disability and needed accommodation."

Gray stated to the NHHCR investigator assigned to Green's NHHCR and EEOC administrative complaints that when Gray met with Green and her husband on December 12, they told him that Green was receiving social security benefits and that due to the eligibility requirements for those benefits, she could only work a part-time schedule.  Gray stated during the investigation that he advised Green to talk to the Sears Human Resources Department ("HR") about her disability issues and scheduling needs, although he agreed to reduce her hours.  The record does not indicate that HR was ever advised of Green's disability.  Gray told Dale Thibault, who worked in HR, that because Green was "collecting," she needed her hours reduced.  Thibault stated during the investigation that while she assumed that Green was collecting some kind of social security or disability benefit, she did not ask about, and was not told, the nature of Green's disability.  Thibault states that Green never talked to her about her disability or complained to her about disability discrimination, although she did talk and complain to Thibault about other issues related to her employment.

Shortly after the December 12 meeting, Gray significantly reduced Green's hours.  During the week of December 21, 2008, Green worked only 9.25 hours, and in January 2009, her hours dwindled to nothing, save for a couple of occasions in February 2009 when she was called into work.

When Green questioned Gray and Thibault about her diminished hours, she was told that her hours were reduced because she had requested a reduction, and that because her performance and attitude had declined in November and December 2008, she had not been prioritized in scheduling in the weeks leading up to Christmas.  Gray and Thibault advised Green that after Christmas there weren't enough hours available for the part-time employees to work anything but intermittent schedules, as full-time employees were scheduled first.  The EEOC documents attached to Green's complaint reveal that Green's hours during January – April 2009 were consistent with the number of hours other part-time employees were receiving.

Green inquired about hours by phone on a number of occasions during the several months after Christmas.  Green states that she was told by other Sears employees in April 2009 that the store had made twenty new hires, and that Green saw Thibault setting up a training session for new employees.  The

EEOC documents reveal that no associates were hired between January and May 2009.  Thibault stated during the EEOC investigation that when Green came to her office and saw her setting up for a meeting, it was for a managers' meeting.

On April 16, 2009, Green went to Thibault's office and presented her with a letter of resignation.  Green signed a voluntary separation form stating "dissatisfaction with hours" as the reason she was leaving.  Thibault initially encouraged Green to reconsider her decision to resign, as hours for part-time employees would pick up again for back-to-school shopping. Thibault said she would hold the letter for a week while Green thought about it.  It does not appear that Green withdrew her resignation letter, as it was processed by Sears, effective April 16, 2009.

III. Alleged Disability Discrimination

Gray told Green that he reduced her hours more than she had requested due, in part, to her diminished performance in November and December 2008.  At one point in her complaint, Green asserts that there was no decline in the quality of her performance.  At other points, Green states that her performance declined due to the aggravation of her disabilities caused by her full-time schedule.  Green states that Gray did not give her

the opportunity to demonstrate that she could improve her performance with a part-time schedule.

Green alleges that another manager, John O'Neal, listened at the door during Green's December 12 meeting with Gray.  After Green's meeting with Gray, Green states that other employees in the store looked at her differently, as if she were crazy. Green surmises that neither Gray nor Green kept her mental illness confidential.  Green states that shortly after the December 12 meeting, an employee wrote on a note Green had placed on a bulletin board: "I know what you have."

Green reports that due to her disabilities, she is unable to tell time on an analog clock.  As a result, she made errors on her time card.  Green reports that she was ridiculed for those mistakes.  Green states the ridicule felt like "job harassment."

IV.  <u>Reported Performance Issues</u>

On October 30, 2008, Green received a performance review indicating that while her work was generally good with the customers, she needed to improve her interaction with her co-workers.  During November and December 2008, other Sears employees stated that Green was watching them and reporting

their perceived performance deficits to management.  Green was
told to focus on her own work by both Gray and Thibault.

On December 8, 2008, Green states that a Sears manager,
Butch Turner, was rude to her, yelled at her, and on December
10, 2008, falsely accused her of holding up her middle finger to
a mall employee and of making fun of a person with a disability
while at Gloria Jean's coffee shop in the mall.  Green denies
that either of these incidents occurred.  On December 10, 2008,
Turner required Green to sign a "final written warning,"
indicating that she had been warned that she could be terminated
due to those incidents, telling her that she would be fired if
she didn't sign the paper.  Also on December 10, 2008, employees
complained that Green was asking them how her behind looked in a
pair of new pants she was wearing.  Green denies the "behind"
incident.

On February 17, 2009, on one occasion when Green was called
into work, she realized, near the end of her shift, that it was
the anniversary of her father's death.  As a result, she sat on
the counter where she was working and cried.  Green states that
O'Neal saw her and told her to get off the counter, get back to
work, and stop crying.  Green states that O'Neal said that she
had nothing to cry about, that just because she had a disability

she wouldn't be treated differently than anyone else and it
didn't mean she could cry, and that everyone knew she had a
disability.  Green states that O'Neal also called her a
"retard."  Green states that she was devastated and humiliated
by having her disabilities aired in public in that manner.

During the administrative proceedings, O'Neal denied ever
saying anything to Green relating to a disability, as he states
he was unaware of her disability.  O'Neal did say that he told
Green to get off of the counter, and that if she was sad she
could take a few minutes off if she needed.

V.   Stalking Allegations

Green alleges that a man came into Sears on three occasions
and "stalked her," and that the Sears Loss Prevention Department
("LP") did nothing to assist her or protect her.  On December 8,
2008, the man, who had previously been in the store, came into
the department where Green was working.  The man was shopping
for and holding women's clothing and told Green that he was
buying clothing for his mother.  Green states that the man said
"strange and scary" things but does not state what those things
were, although they appear to have been vulgar and sexual in
nature.

Green reported these incidents to LP.  Green reports that no one answered at LP.  When she was unable to reach LP, Green called Gray who told Green to come to his office.  Green states she did report the incident to LP.

LP employee Chuck Anderson wrote a report of a conversation he had with Green about Green's report of the incident, which is attached to the complaint in this matter.  Anderson's report states that Green told Anderson that there was a man acting oddly in Green's department.  Anderson reported that he told Green if it happened again to contact LP or to find another associate right away so that she would not be alone with the man.  Anderson denies failing to respond to Green on any occasion when he was aware that she requested assistance regarding a man who was bothering her.  Anderson stated that Green reported the "stalking" incident to mall security.

On another occasion, Green states that she saw a "ru----filled with p--."  The court surmises that she saw a condom filled with urine.  Green called LP who refused to respond and told her to clean it up.  While Green includes this as an incident involving the man who had previously been in the store, she asserts no facts to indicate any connection to that man aside from her supposition.

13

VI.   Alleged Religious Discrimination

Green states that she was discriminated against at Sears
because she is Jewish.  Green states that she asked for a day
off to celebrate Chanukah with her sister, but was not given the
day off.  Green further asserts that when she asked if Sears
sold "Jewish" wrapping paper, she was told they did not, but
that she should buy all the "Jewish" socks Sears was selling, as
no one else would buy them.

VII. Alleged Age Discrimination

In the administrative action in this matter, Green sent an
email to Anne Giantarro at the EEOC stating that Sears had "age
discriminated" her.  In support of her age discrimination claim,
Green asserts that she was forty-three years old when she worked
at Sears.  Green was the oldest Sears associate on her "team."
Green states that Gray favored other employees on her team.
Green also claims that Gray never listened to her, but listened
to other team members, and that he allowed other team members to
sit down and did not allow Green to sit down.  Green states that
a younger employee was promoted to manager, and that another
younger employee was allowed to use her cell phone while working

on the store floor, which apparently Green was not allowed to do.

**Discussion**

I.   ADA Claim – Disability Discrimination

A.   Reduction in Hours

Title I of the Americans with Disabilities Act ("ADA"), states:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employment compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Green alleges that she was discriminated against at Sears when she was harassed and treated poorly by employees and managers at the store once they found out that she had mental illnesses.  Further, she states that she was denied work because of her disability, and that her resignation was in fact a constructive discharge from employment.

A plaintiff must prove three elements in order to obtain relief under Title I of the ADA:

> (1) at the time of her termination she was disabled as defined by the ADA; (2) despite being disabled she was otherwise qualified to do the essential tasks of her job, with or without reasonable accommodation by her

employer; and (3) she was discharged, in whole or in
part, because of her disability.

Lillibridge v. Wooden Soldier, Ltd., 957 F. Supp. 12, 14 (D.N.H.
1997) (citing Katz v. City Metal Co., Inc., 87 F.3d 26, 30 (1st
Cir. 1996)) (internal quotations omitted).

Based on Green's assertions that her mental illness
qualified her for social security disability benefits, the court
can assume that she suffered from a qualifying disability.
Further, the record indicates sufficient facts to allow the
court to infer that, given a part-time work schedule, Green was
able to perform the essential functions of her job.
Accordingly, Green satisfies the first two elements of a claim
under Title I of the ADA.

Green fails to demonstrate, however, that her separation
from employment was a constructive discharge connected to her
disability.  Green states that she did not tell anyone at Sears
that she was disabled and needed a part-time schedule until
December 2008, after four months of working a full-time
schedule.  Green's request for a part-time schedule was
immediately honored, and her hours were reduced.  Green asserts
that the severe reduction in her hours amounted to a
constructive discharge.

Green points to being given only 9.25 hours during the week
before Christmas, a very busy shopping week, during which other
employees received more hours, as evidence that Gray
discriminated against her based on her disability.  Gray stated
that he de-prioritized Green's hours because she had requested
fewer hours, and because her job performance had declined.
Green indicates that her declining job performance was the
result of her difficulty in working full-time as a result of her
disability.  Nothing in the record, however, demonstrates that
anyone at Sears was aware of the fact that her decline in work
performance was due to her disability.  Accordingly, there is no
assertion upon which the court can ground a claim of
discriminatory intent in any employment action that reduced her
hours.

Further, Green has not disputed the evidence in the record
demonstrating that, while Green's hours did decline
significantly (to virtually nothing beginning in January 2009),
this was not inconsistent with the hours other part-time
employees received.  The record also demonstrates that, when
Green submitted her letter of resignation, Thibault asked Green
not to leave because Green was a good employee and would be
given more hours when there was more business.  These facts,

taken together, demonstrate that there was no intent to

discharge Green, and that her resignation due to her reduction

in hours was not the result of her disability or any

discrimination derived therefrom.  Accordingly, Green has failed

to state a claim that her separation from Sears violated the

ADA.

     B.   <u>Hostile Work Environment</u>

     Green cites a number of incidents of alleged harassment by

coworkers based on her disability.  To establish a claim under

the ADA alleging a hostile work environment, "a plaintiff must

show that her workplace was permeated with discriminatory

intimidation, ridicule, and insult that was sufficiently severe

or pervasive to alter the conditions of . . . [her] employment

and create an abusive working environment."  <u>Colón-Fontánez v.</u>

<u>Mun'y of San Juan</u>, 660 F.3d 17, 43 (1st Cir. 2011) (quoting

<u>Quiles-Quiles v. Henderson</u>, 439 F.3d 1, 7 (1st Cir. 2006)

(internal quotations and alterations omitted).  To determine

whether a workplace is hostile or abusive, courts should refer

to the totality of the circumstances.  <u>Colón-Fontánez</u>, 660 F.3d

at 43-44.  In evaluating the circumstances in a workplace,

"courts have recognized the following factors, among others, as

relevant: the severity of the conduct; its frequency; and

whether it unreasonably interfered with the victim's work performance." Id. at 44.  The First Circuit has described the court's proper role in conducting this evaluation:

> [O]ur role is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment.  Case law is clear that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment.

Id. (internal citations and quotations omitted).  Here, even generously construing the allegations in the complaint, Green's allegations "do not rise to the level of severity or pervasiveness" sufficient to state a hostile work environment claim.  See id.  Green's complaint alleges that:  on a single occasion, O'Neal yelled at her and told her that she wouldn't be allowed to cry at work just because she is disabled; she believed her coworkers looked at her differently, as if she were crazy, after she spoke to a manager about her disabilities; and someone at work wrote "I know what you have" on a note she had written.  These allegations do not describe acts that were so severe as to alter the conditions of Green's employment or to create a pervasively abusive working environment.  Green has therefore failed to state a claim under the ADA based on a hostile workplace.

II.   <u>Stalking Allegations</u>

Green states that LP was indifferent to her concerns regarding a man whom she alleges was "stalking" her by coming into the store twice and, on one occasion, saying sexual and inappropriate things to her.  To the extent Green attempts to allege that LP, or anyone at Sears, was indifferent to her complaint that she was afraid of the man in the store, her allegations do not bear out that assertion.  To the contrary, while LP may not have responded to Green's request for assistance exactly as she would have liked on every occasion, there is nothing in the complaint that indicates that LP denied her assistance, or failed to respond to her concerns, based on any improper motivation to discriminate against her or otherwise harm her.  Green has failed to state any ascertainable cause of action against Sears or any Sears employee arising out of the alleged stalking incidents.

III. <u>Religious Discrimination</u>

The Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), <u>et seq.</u> ("Title VII"), prohibits employment practices that subject employees to discrimination with respect to their religion in the terms and conditions of their employment.  <u>Harris v.</u>

Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  This prohibition

includes protection from a discriminatorily hostile or abusive

environment.  Id.  Green alleges that she was not given Chanukah

off, and that a coworker made a comment to her that she,

presumably because she was Jewish, would be the only person

willing to buy "Jewish socks."  These allegations, without more,

fall far short of the kind of "severe or pervasive" conditions

required to constitute a discriminatorily hostile or abusive

work environment.  See O'Rourke v. City of Providence, 235 F.3d

713, 728 (1st Cir. 2001).  Green has thus failed to state any

religious discrimination claim upon which relief might be

granted.

IV.  Age Discrimination

     Green asserts that she was subjected to age discrimination

because her boss favored coworkers who were younger than she.

The exclusive remedy for an age discrimination claim in the

employment context is the Age Discrimination in Employment Act,

29 U.S.C. §§ 621 et seq. ("ADEA").  See Tapia-Tapia v. Potter,

322 F.3d 742, 745 (1st Cir. 2003).  The ADEA makes it unlawful

for an employer "to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual

. . . because of such individual's age."  29 U.S.C. § 623(a)(1).

Even assuming the truth of Green's assertions regarding the favoritism of her colleagues, Green has alleged no facts which suggest that the favoritism was due to the other employees being younger than she.  Accordingly, Green has failed to state an age discrimination claim upon which relief might be granted.

V.    Other Allegations

In her complaint, Green alleges that she was subject to discrimination based on her gender, national origin, and race, and that she was subject to retaliation.  Green has not alleged any facts to support any of these assertions.  See Fed. R. Civ. P. 8(); see also Iqbal, 556 U.S. at ___, 129 S. Ct. at 1949 (to be sufficient to state a claim, complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

## Conclusion

For the foregoing reasons, the court finds that the complaint in this matter (doc. nos. 1, 4, 6, 8 and 9) fails to state any claim upon which relief might be granted and therefore recommends that this action be dismissed in its entirety.  Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R.

22

Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011) (citing United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge


January 3, 2012

cc:  Tammy Green, pro se

LBM:jba